UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————————

UNITED STATES OF AMERICA

       - against -                  13 Cr. 947 (JGK)

FRANKLIN TAVAREZ,                MEMORANDUM OPINION AND
                                   ORDER

                    Defendant.
——————————————————————————

JOHN G. KOELTL, District Judge:

     On November 6, 2014, the jury in this case found the
defendant, Franklin Tavarez, guilty of a conspiracy, in
violation of 21 U.S.C. § 846, to distribute and to possess with
intent to distribute a detectable amount of cocaine, in
violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  The
defendant now moves pursuant to Rule 29(c) of the Federal Rules
of Criminal Procedure for a judgment of acquittal.  In the
alternative, he moves for a new trial pursuant to Rule 33(a) of
the Federal Rules of Criminal Procedure. For the reasons
explained below, the motions are **denied.**

I.

     There was sufficient evidence introduced at trial from
which the jury could have found as follows.

     On September 4, 2013, agents of the New York Drug
Enforcement Strike Force (the "Strike Force"), consisting of
members of the Drug Enforcement Administration ("DEA"), the New
York City Police Department ("NYPD"), and the New York State
Police, arrested Tavarez and three other people, Francisco

Areche-Cabrera, Juan Rodriguez Tavarez, and Maribel Pantoja in the parking lot of a Target on West 225th Street in the Bronx.

The arrest was the culmination of an investigation that began in May 2013.  Detective Jugony Rosado of the NYPD, an officer of the Strike Force, testified that in May 2013, he was put in touch with Rodriguez Tavarez, and Detective Rosado represented himself as a drug dealer in phone conversations with Rodriguez Tavarez.  Tr. 86.  On June 4, 2013, Detective Rosado first met with Rodriguez Tavarez to discuss terms of a future drug transaction.  Tr. 87, 90.  At the meeting, Detective Rosado introduced another undercover officer who went by the name Esteban to Rodriguez Tavarez and his associates.  Tr. 88.  The parties agreed on a price and quantity of cocaine for the transaction, and Rodriguez Tavarez stated that he would speak to his people in Houston, Texas, to "get the business rolling." Tr. 90-91.

The following day, June 5, 2013, a $4000 cash withdrawal was made from the defendant's debit account from a bank in Houston, Texas.  Tr. 345.  The Government showed the record of this withdrawal together with records of multiple bank accounts in the defendant's name, revealing a series of large cash withdrawals and deposits from the beginning of 2012 through the summer of 2013.  Tr. 328-40, 343-46.  Records of three of the defendant's bank accounts showed a total of approximately

2

$194,000 in deposits and $151,000 in withdrawals during this time period.  Gov't Ex. 206.  The Government also introduced the defendant's 2012 and 2013 tax returns, which were filed jointly with his wife, Astry Diaz.  The defendant was listed as unemployed both years and reported no income.  Tr. 326-27.  Ms. Diaz reported income from her employment with Continental Airlines, but the bank accounts did not show any deposits from pay stubs or from Continental Airlines.  Tr. 346.

In the months following the June 4 meeting, Rodriguez Tavarez spoke with Esteban over the phone about the terms of the cocaine deal.  Tr. 93, 166-67.  Esteban testified that he and Rodriguez Tavarez arranged to meet on September 4, 2013. Tr. 168.  They first met in the afternoon at a Pathmark parking lot in Manhattan, and discussed an initial deal in which Rodriguez Tavarez would pay $90,000 for five kilograms of cocaine, two of which would be sold on consignment.  Tr. 169-70, 175.  Esteban and Rodriguez Tavarez did not do the deal at that location because it was too crowded, and they later agreed to meet instead at the Target parking lot at West 225th Street in the Bronx.  Tr. 170-71.

At the Target parking lot, Esteban met with Rodriguez Tavarez and Pantoja.  Tr. 174-75.  Esteban, who was wearing a hidden recording device, discussed the terms of the transaction with them.  Tr. 179.  The recording device captured, among other

3

things, Rodriguez Tavarez assuring Esteban that his organization
would be able to distribute large amounts of cocaine.  Tr. 184-
85.  As part of the deal, Esteban and another undercover officer
showed Rodriguez Tavarez and Pantoja a bag of sham cocaine.
Tr. 175.  Esteban, Rodriguez Tavarez, and Pantoja then agreed
that they would go to an apartment to complete the transaction,
but Esteban insisted on seeing the $90,000 first.  Tr. 176.
Rodriguez Tavarez and Pantoja then began arranging for someone
to bring the money to the Target parking lot, with Pantoja
giving the absent parties directions by phone.  Tr. 176, 192.
Phone records introduced by the Government showed that Pantoja
was calling a phone number with a Houston area code ending in
9990.  Tr. 245, 248.  The Government also introduced phone
records showing several calls between the 9990 number and the
defendant's phone from August 2013 to the date of the
defendant's arrest.  Tr. 248-49; Gov't Ex. 207.

Rodriguez Tavarez and Pantoja left the parking lot.  They
were surveilled by a Strike Force surveillance team, including
Detective Rosado and DEA Agent Jeff Stratton, who also testified
about his observations.  Tr. 236.  Rodriguez Tavarez and Pantoja
returned to the parking lot a short while later in a minivan
registered to the defendant.  Tr. 235, 237.  The defendant drove
the minivan and Areche-Cabrera was in the front passenger seat,
with Rodriguez Tavarez and Pantoja behind them.  Tr. 106-10.  A

4

fifth passenger, Dievy Pineda, was also in the minivan.
Tr. 112-13.  Esteban approached the minivan, and the defendant
shook his hand from the driver's seat.  Tr. 208.  Pantoja was on
the driver's side of the van with the sliding door open.  She
told Areche-Cabrera to show Esteban the money.  Tr. 208-09.
Then the defendant repeated to Areche-Cabrera to show the money.
Tr. 209.  Areche Cabrera picked up the bag and showed it to
Esteban.  Id.  The defendant urgently repeated that Areche-
Cabrera should show Esteban the money.  Id.  The defendant then
grabbed the bag and put it on his lap, opened it, reached inside
and grabbed two bundles of money and showed them to Esteban.
Id.  Esteban grabbed for the two bundles and also reached into
the bag to assure that the bag was full of money, and then said,
"Ok."  Id.  The defendant turned around in the direction of
Pantoja and said, "It's only 90.  Why don't we just give it to
him?"  Tr. 209-10.  Esteban then began walking away from the
van, and signaled to the field team that they could make the
arrest.  Tr. 210.  Following the arrest, officers discovered the
bag containing approximately $95,000 in a floor compartment of
the defendant's minivan.  Tr. 239, 241.

## II.

To succeed on a motion for a judgment of acquittal pursuant
to Rule 29 of the Federal Rule of Criminal Procedure, the
defendant must show that no rational trier of fact, viewing the

evidence in the light most favorable to the Government, could have found the defendant guilty beyond a reasonable doubt of the essential elements of the crime charged. United States v. Desena, 287 F.3d 170, 176 (2d Cir. 2002). A defendant making an insufficiency claim "bears a very heavy burden." Id. at 177; see also United States v. Macklin, 927 F.2d 1272, 1277 (2d Cir. 1991) (collecting Second Circuit cases).

In considering the sufficiency of the evidence, the Court must "view the evidence presented in the light most favorable to the government, and . . . draw all reasonable inferences in its favor." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000). The Court must analyze the pieces of evidence "not in isolation but in conjunction," United States v. Matthews, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999).

"[T]o avoid usurping the role of the jury," the Court must "not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury." Autuori, 212 F.3d at 111 (internal citation omitted). Thus, the Court must "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the

6

evidence." <u>United States v. Morrison</u>, 153 F.3d 34, 49 (2d Cir. 1998).  The jury's verdict "may be based entirely on circumstantial evidence." <u>United States v. Martinez</u>, 54 F.3d 1040, 1043 (2d Cir. 1995); <u>see also</u> <u>United States v. Aleskerova</u>, 300 F.3d 286, 292 (2d Cir. 2002); <u>Macklin</u>, 927 F.2d at 1277; <u>United States v. Arroyo</u>, No. 12cr552, 2013 WL 227733, at *2 (S.D.N.Y. Jan. 22, 2013), <u>aff'd</u>, 2015 WL 264640 (2d Cir. Jan. 22, 2015).

To satisfy its burden on Count One, the only charge in this case, the Government was required to establish beyond a reasonable doubt (1) the existence of the conspiracy charged in the indictment—that there was an agreement to distribute cocaine or to possess cocaine with the intent to distribute it; and (2) that the defendant "'knowingly' engaged in the conspiracy with the 'specific intent to commit the [offense] that [was] the objects of the conspiracy.'" <u>Aleskerova</u>, 300 F.3d at 292 (quoting <u>United States v. Monaco</u>, 194 F.3d 381, 386 (2d Cir. 1999); <u>see also</u> 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846.  In this case, the Government demonstrated the existence of the conspiracy by showing the combined efforts of Rodriguez Tavarez, Pantoja, Areche-Cabrera, and the defendant to purchase cocaine from Detective Rosado and Esteban with the intent to distribute that cocaine.  The Government demonstrated the defendant's knowing participation in the conspiracy and specific intent to

possess cocaine with the intent to distribute it not merely
through his presence at the drug deal but through his
affirmative words and actions in promoting the deal, and his
financial and phone records during the course of the conspiracy.
Based on the testimony of the witnesses and the evidence
introduced at trial, a reasonable juror could readily have
concluded beyond a reasonable doubt that the defendant knowingly
participated in a conspiracy to possess cocaine with the intent
to distribute it.

The defendant argues that the evidence against him is
circumstantial, and that each piece of evidence provides "equal
or nearly equal circumstantial support" for the competing
inferences of innocence and guilt, which therefore requires
acquittal. United States v. Glenn, 312 F.3d 58, 70 (2d Cir.
2002). The defendant contends that pieces of evidence such as
records of his phone calls to the Houston phone number and
testimony about his role in driving the minivan only show
association with the conspirators and presence at the scene of a
crime, neither of which is enough to show knowing involvement in
a conspiracy. Aleskerova, 300 F.3d at 292. These arguments
downplay the weight of the evidence which, viewed as a whole,
shows the defendant's involvement in the conspiracy. The
defendant was not merely present at the scene of the crime, he
"directly participated in the drug transaction underlying the

8

conspiracy charge." United States v. Andino, 627 F.3d 41, 47 (2d Cir. 2010) (affirming sufficiency of evidence of conviction under 21 U.S.C. § 846).  The defendant argues that the jury should not have credited Esteban's testimony about the defendant's actions at the scene of the crime based on minor inconsistencies in Esteban's testimony.  This argument is without merit because "[i]t is the province of the jury and not of the court" to assess a witness's credibility.  United States v. O'Connor, 650 F.3d 839, 855 (2d Cir. 2011) (citation and quotation marks omitted).

Moreover, a jury may rely on circumstantial evidence in reaching its verdict, and often must do so in resolving conspiracy allegations.  See Aleskerova, 300 F.3d at 292-93. The defendant's large amounts of cash deposits and withdrawals leading up to and during the course of the conspiracy, along with the lack of any reported income, are circumstantial evidence of the defendant's participation in the charged conspiracy.  See, e.g., United States v. Young, 745 F.2d 733, 762-63 (2d Cir. 1984) (holding that the defendant's "large amount of unexplained and unreported wealth was . . . highly probative of [the defendant's] involvement in narcotics trafficking").  At trial, there was no evidence that any other source of income existed that would explain the defendant's financial records.

The defendant also argues that there is no evidence that connects his June 5 cash withdrawal in Texas to the drug conspiracy, and the defendant thus argues that the withdrawal could have been for any number of innocent reasons.  This argument ignores the significance of the withdrawal in the mosaic of evidence against the defendant.  The jury could well have found that the withdrawal was significant because it placed the defendant, who then resided in New Jersey, Tr. 369, in Houston, Texas, one day after Rodriguez Tavarez stated to Detective Rosado that he would be speaking with his associates in Houston about the terms of the drug transaction.  The defendant's presence in Houston at that time was part of the circumstantial evidence against the defendant.  See Aleskerova, 300 F.3d at 293 (holding that defendant's travel plans that coincided with "critical moments of the conspiracy" supports an inference of involvement in the conspiracy).  Moreover, the withdrawal was part of the pattern of unexplained cash withdrawals which were themselves circumstantial evidence of participation in the conspiracy.  See Young, 745 F.2d at 762-63.

Viewing the evidence and inferences in the light most favorable for the Government, a rational juror could have concluded beyond a reasonable doubt that based on all of the evidence, the defendant conspired to distribute cocaine or to

possess cocaine with the intent to distribute it. The motion for a judgment of acquittal is therefore **denied.**

## III.

Rule 33 of the Federal Rules of Criminal Procedure provides that the trial court may grant a defendant's motion for a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a).  The standard for granting a motion pursuant to Rule 33 based on an alleged insufficiency of the evidence is also an exacting one.  A court will grant a new trial only "in the most extraordinary circumstances." United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993) (citing United States v. Imran, 964 F.2d 1313, 1318 (2d Cir. 1992)).  In evaluating the sufficiency of the evidence for purposes of Rule 33, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (internal citation omitted).  There must be "a real concern that an innocent person may have been convicted." Id.  While the Court has "broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," it must nonetheless "exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." Id. (internal citation and quotation marks omitted); see also Arroyo, 2013 WL 227733, at *4.

**A.**

The defendant asserts that the Government interfered with his "right to offer the testimony of witnesses," <u>Washington v. Texas</u>, 388 U.S. 14, 19 (1967), when the Government indicated to three of the defendant's prospective witnesses that they might expose themselves to criminal penalties if they were to testify. The defendant argues that he intended to call his codefendant, Areche-Cabrera, who by the time of trial had pleaded guilty, and Dievy Pineda, who initially was named as a codefendant before the charges against him were dismissed without prejudice.  The defendant's wife, Astry Diaz, did testify, but the defendant now contends that she was forced to limit her testimony due to the Government's representation that she could be exposed to criminal liability.  For the reasons that follow, the defendant's arguments are without merit.

**i.**

The defendant contends that Areche-Cabrera had informed the Government during his own proffer sessions that the defendant did not know what was in the bag containing the $95,000.  The defense sought to have Areche-Cabrera testify, but Areche-Cabrera's counsel informed the defense prior to trial that Areche-Cabrera would invoke his Fifth Amendment right not to testify at trial.  The defendant subsequently informed the Court that he would not be calling Areche-Cabrera as a witness.  <u>See</u>

12

Letter Dated October 31, 2014, No. 13cr947 (ECF No. 98).  The
defendant did not object to Areche-Cabrera's assertion of his
Fifth Amendment privilege or seek any relief from the Court at
the time.  The defendant did not suggest that there was any
impropriety involved in Areche-Cabrera's decision to exercise
his Fifth Amendment privilege and decline to testify.

The defendant also sought to call Dievy Pineda, who was
with the defendant in the minivan and was arrested on September
4, but eventually had all charges against him dismissed without
prejudice.  In an earlier motion to preclude evidence, Pineda
had submitted an affirmation testifying to the defendant's lack
of knowledge of the conspiracy.  The Government forwarded the
affirmation to Pineda's defense counsel to ensure that she was
aware of Pineda's involvement with the case and that Pineda
would be represented by counsel if he testified.  Approximately
three months later, prior to the trial, an Assistant United
States Attorney in this case encountered Pineda's defense
counsel on an unrelated matter, informed her that the defendant
planned to call Pineda as a witness, and stated that the charges
against Pineda were dismissed without prejudice.  As a result of
these interactions with the Government, and similar
representations conveyed to Pineda's counsel by the defendant,
Pineda decided to invoke his Fifth Amendment privilege and
refused to testify.

During the trial, the defendant requested that this Court preclude Pineda's assertion of the Fifth Amendment privilege, or in the alternative, compel the Government to grant Pineda immunity because the Government allegedly coerced Pineda into asserting his Fifth Amendment privilege.  The Court held a hearing at which Pineda's counsel testified as to the interactions between herself and the Government.  She testified credibly that the Government never threatened to reopen the case against Pineda if he testified in this case, and that she advised Pineda to invoke the Fifth Amendment privilege based on Pineda's legitimate fear of prosecution.  Tr. 265, 268.

The Court subsequently denied the defendant's motion to preclude Pineda's assertion of his Fifth Amendment privilege or, in the alternative, to compel the Government to grant Pineda immunity.  Tr. 282-90.  The Court recognized that a criminal defendant has a right under the Sixth Amendment "to have compulsory process for obtaining witnesses in his favor," but a valid Fifth Amendment claim provides a justification for compromising the defendant's Sixth Amendment rights.  United States v. Rodriguez, 706 F.2d 31, 36 (2d Cir. 1983) (citing Washington, 388 U.S. at 17).  The Court held that based on the charges that had recently been brought against him, Pineda could reasonably believe that any testimony he would provide about his presence in the minivan or his connection to the defendant could

14

be self-incriminating.  Accordingly, Pineda's invocation of his Fifth Amendment privilege was valid.  See, e.g., United States v. Tutino, 883 F.2d 1125, 1139 (2d Cir. 1989) (holding that the witness had validly asserted the Fifth Amendment privilege based on legitimate fear of prosecution).

The Court also held that the defendant could not satisfy the three-prong test for compelling the Government to grant immunity, which requires that the defendant show: first, that the Government has essentially coerced the defense witness into asserting the privilege through the Government's overreaching or that the Government has engaged in discriminatory grants of immunity; second, that the witness's testimony is material, exculpatory, and not cumulative; and third, that the testimony is not obtainable from any other source.  See United States v. Diaz, 176 F.3d 52, 115 (2d Cir. 1999).  The defendant did not satisfy the first two prongs of this test, and therefore did not show that there were "extraordinary circumstances" that required a compelled grant of immunity.  United States v. Praetorius, 622 F.2d 1054, 1064 (2d Cir. 1979).[1]

In the present motion, the defendant presents no argument as to why the Court's ruling with respect to Pineda was incorrect.  Accordingly, the defendant's arguments as to Pineda

---

[1] Indeed, there do not appear to be any published decisions within the Second Circuit in which a district or appellate court has compelled the Government to grant immunity to a defense witness.  See, e.g., United States v. Basciano, 763 F. Supp. 2d 303, 323 (E.D.N.Y. 2011) (noting same).

remain without merit for the reasons stated in the Court's ruling.

The defendant did not object during the trial to Areche-Cabrera's assertion of his Fifth Amendment privilege.  In any event, any recourse the defendant might have suggested would have been unavailable for substantially the same reasons stated in the Pineda ruling.  Although Areche-Cabrera had already pleaded guilty on charges relating to his involvement in the conspiracy, "the Fifth Amendment privilege is not lost after a witness has pleaded guilty if the witness is still subject to a realistic risk of incrimination on other charges, or if the desired testimony about the transaction in question would give rise to a risk of incrimination in connection with other transactions." Rodriguez, 706 F.2d at 36-37; see also United States v. Lumpkin, 192 F.3d 280, 285-86 (2d Cir. 1999) (holding that codefendant who had pleaded guilty had a valid claim of privilege).  Areche-Cabrera could have reasonably feared further prosecution if he were to testify about the events surrounding the offense to which he pleaded guilty.  Moreover, the defendant has not suggested that the Government overreached or granted immunity in a discriminatory manner, and therefore the defendant would not have had a colorable claim for a compelled grant of immunity for Areche-Cabrera.

16

## ii.

The defendant also argues that his right to call witnesses was compromised when he was forced to limit the testimony of his wife, Astry Diaz, in response to the Government's stated intention to cross examine Ms. Diaz about areas that could have exposed her to criminal liability.

During the trial, the Government advised the Court that the defense would be calling Ms. Diaz to testify and that the Government believed its cross examination would touch on the bank records and tax returns that were in Ms. Diaz's name, which potentially could have exposed her to criminal liability.  See Def. Mot. Ex. I (Letter Dated November 5, 2014).  When the Court raised the issue with the parties, defense counsel indicated that Ms. Diaz's direct testimony would only consist of background information, information about the defendant's relationship with Areche-Cabrera, and testimony about property vouchers Ms. Diaz signed for all of the co-defendants.  Tr. 354-55.  The Government argued that it should be able to cross examine Ms. Diaz about the financial records to diminish her credibility as a witness, because some of her testimony conflicted with earlier testimony given by Detective Rosado. The Court ruled that the Government would not be allowed to cross examine Ms. Diaz about the financial records because the purported conflict between Ms. Diaz and Detective Rosado was

minor and did not go to the Detective's truthfulness.  Tr. 362-63.

The defendant now argues that he intended to elicit testimony from Ms. Diaz about the defendant's businesses in the Dominican Republic and his reasons for traveling to Texas in June 2013, and that he was coerced by the Government into forgoing this testimony.  However, the defendant never proffered any of this testimony to the Court prior to this motion.  The defendant proffered a limited number of areas of testimony, and the Court's ruling allowed the defendant to examine Ms. Diaz about those areas without the potential for exposure to criminal liability on cross examination.  In this motion, the defendant has not suggested any alternative course that should have been taken by the Court and the defendant has presented no argument that any ruling by the Court was erroneous in any way.

Moreover, if the defendant had sought to offer additional and more significant testimony from Ms. Diaz, the Court would have considered the appropriate scope of cross examination for that testimony.  That kind of hypothetical speculation about the proper scope of cross examination for testimony that was never offered is not the basis for a new trial.  See United States v. Cedeno, 644 F.3d 79, 81 (2d Cir. 2011) (stating that trial court's decision of whether to limit cross examination is reviewed for abuse of discretion).  Accordingly, the defendant

18

cannot show that his own limitation of Ms. Diaz's testimony deprived him of the right to call witnesses.

**B.**

The defendant contends that it was error for the Court to admit the defendant's financial records—namely, records from three of the defendant's bank accounts showing cash deposits and withdrawals in 2012 and 2013 and tax returns for the same years—because the prejudice from those records substantially outweighed their probative value in violation of Federal Rule of Evidence 403.

The defendant objected to the admission of the financial records at trial.  Prior to the parties' opening statements, the Court explained that it is well settled that evidence of large amounts of "unexplained wealth is relevant to create an inference of illicit gain."  United States v. Napoli, 173 F.3d 847, 1999 WL 265024, at *3 (2d Cir. 1999) (summary order); see also United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994) (evidence of possession of large amount of cash was admissible because the defendant reported only modest amounts on his tax returns and a reasonable jury could conclude that "unexplained cash" indicated a source of illicit income).  The Court indicated that such unexplained wealth would be introduced as circumstantial evidence of participation in illicit activity, rather than as evidence that the defendant had committed past

crimes in not reporting income.  See United States v. Ojeda, 412
F. App'x 410, 412 (2d Cir. 2011) (summary order) (stating that
"evidence of unexplained wealth is generally probative of
narcotics crimes, and therefore is not relevant simply to
propensity").  The Court also found that the evidence of the tax
returns would not result in unfair prejudice because tax evasion
is not more sensational or prejudicial than evidence of the
narcotics conspiracy with which the defendant was charged.  See
Fed. R. Evid. 403; United States v. Roldan-Zapata, 916 F.2d 795,
804 (2d Cir. 1990) (finding that evidence admitted was not
unfairly prejudicial because it "did not involve conduct any
more sensational or disturbing than the crimes with which [the
defendant] was charged").  Ultimately, the Court deferred ruling
on the admissibility of the financial records, stating that it
would "await the evidence to make a final ruling with respect to
the admissibility of the . . . records from 2012 and 2013 so
that the Court can make the final 403 balancing analysis."  Tr.
59.

Prior to the conclusion of the Government's case-in-chief,
the Court ruled that the Government could introduce the
defendant's cash withdrawals and deposits for a period of
approximately twenty-one months in 2012 and 2013, and the
defendant's 2012 and 2013 tax returns.  Tr. 293.  The Court held
that the records linked the defendant to "access to substantial

amounts of cash which could be used for a narcotics transaction." Tr. 294.  The Court also noted that there was testimony that tied the conspiracy to Texas, and some of the withdrawals were made in Texas.  Tr. 294.  By limiting the evidence to twenty-one months of transactions, the Court avoided unnecessarily cumulative evidence and ensured that the evidence was tailored to the time leading up to and during the conspiracy.  Moreover, the Court gave the jury a limiting instruction, instructing the jury that it could not consider the financial records and tax returns for any purpose other than its relevance to the crime charged in the Indictment.  Tr. 490.

The defendant now argues that it was error to admit the financial records because the Government failed to prove that the purpose of Rodriguez Tavarez's call to Texas after the meeting on June 4, 2013, was to gather money for the drug transaction.  However, for substantially the same reasons explained above, this argument has no merit.  The records placing the defendants in Houston, Texas on June 5 were in fact relevant, and the fact that the defendant was withdrawing cash when the conspirators were preparing to purchase cocaine was also relevant.  Moreover, as the Court explained at trial, courts regularly admit evidence of unexplained wealth, without more, as circumstantial evidence of participation in a drug conspiracy.  See, e.g., See United States v. Mejia, 376 F. Supp.

2d 460, 462 (S.D.N.Y. 2005) (quoting United States v. Viserto, 596 F.2d 531, 536 (2d Cir. 1979)).

Accordingly, the financial records and tax returns were properly admitted in evidence.

## C.

The defendant next contends that the Government made a number of improper statements in summation that misstated the evidence and thereby deprived the defendant of a fair trial. The defendant exclusively points to references in the Government's summation to Rodriguez Tavarez's call to Texas and the defendant's subsequent cash withdrawal from his account in Texas. See Tr. 418 ("Now, where was Franklin Tavarez during this June meeting? . . . He is in Texas.  You know that from his debit card records that he's using his debit card in Texas."); Tr. 423 ("And at the end of that meeting Juan [Rodriguez] Tavarez made clear that he was going to get his money guys in Texas working, pull together the necessary funds to buy that cocaine.  What happens the day after that meeting?  There is a withdrawal of $4,000 out of the defendant's Chase Bank account . . . in the Houston area.").  Although the defendant did not make any contemporaneous objections during the Government's summation, the defendant now argues that these statements misstated Detective Rosado's testimony about what Rodriguez Tavarez said at the June 4 meeting.

22

"The government . . . has broad latitude in the inferences
it may reasonably suggest to the jury during summation," and
"[i]mproper summation statements violate a defendant's due
process rights only if they cause substantial prejudice to the
defendant." United States v. Edwards, 342 F.3d 168, 181 (2d
Cir. 2003) (internal quotation marks and citation omitted).  A
new trial is appropriate "only when the statements, viewed
against the entire argument before the jury, deprived the
defendant of a fair trial." United States v. Bermudez, 529 F.3d
158, 165 (2d Cir. 2008) (internal quotation marks and citation
omitted).

The Government's statements in this case were fair
inferences from the evidence presented at trial.  The statements
concerning the defendant's withdrawals in Texas are drawn from
the undisputed evidence of the defendant's financial records.
Similarly, the defendant's presence in Houston is supported by
the bank records.  As to the Government's statement that
Rodriguez Tavarez would have people in Texas "pull together the
necessary funds," the defendant argues that Detective Rosado's
testimony on cross examination contradicts this statement
because he testified that Rodriguez Tavarez would be speaking to
people in Texas about pricing, rather than getting money
together.  Tr. 132-33.  However, Detective Rosado testified on
direct examination that Rodriguez Tavarez stated he would be

23

getting money together.  Tr. 91.  And on cross examination,
Detective Rosado testified that when he said Rodriguez Tavarez
was going to get in touch with the people in Houston, "they
wanted to get the money together."  Tr. 132.  There was nothing
inconsistent about Rodriguez Tavarez contacting his people in
Texas about the price they were prepared to pay for the drugs
and those same people preparing to gather the cash that they
would need to purchase the drugs.  The Government could fairly
argue from the evidence that it was significant that the
defendant withdrew $4,000 in cash in Houston the day after the
conversation occurred.  Accordingly, the Government's statements
in summation were well within the evidence presented, and do not
approach the demanding standard of depriving the defendant of a
fair trial.

**D.**

Finally, the defendant argues that the cumulative effect of
all of the above conduct by the Government and rulings by the
Court deprived the defendant of a fair trial.  Because the Court
has found that there was no misconduct by the Government and
that the defendant has not identified any error in the Court's
rulings, this argument is without merit.

In light of the foregoing, the defendant's motion for a new
trial under Rule 33 of the Federal Rules of Criminal Procedure
is **denied.**

## Conclusion

The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed above, the remaining arguments are either moot or without merit.  For the foregoing reasons, the defendant's motions for acquittal under Rule 29(c) and for a new trial under Rule 33(a) are **denied.  The Clerk is directed to close Docket No. 127.**

SO ORDERED.

Dated:    New York, New York
          March 12, 2015         _____/s/_____
                                        John G. Koeltl
                                 United States District Judge